RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-2404

JEFFREY DUANE COX,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cr-00198-1—Robert J. Jonker, Chief District Judge.

Argued: June 21, 2017

Decided and Filed: September 14, 2017

Before: KEITH, BATCHELDER, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant. Sean M. Lewis, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant. Sean M. Lewis, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

KEITH, J., delivered the opinion of the court in which BATCHELDER and SUTTON, JJ., joined. SUTTON, J. (pp. 16–21), delivered a separate concurring opinion.

---

**OPINION**

---

DAMON J. KEITH, Circuit Judge.  Defendant Jeffrey Duane Cox ("Cox") was convicted of seven counts of Sexual Exploitation of a Child and/or Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a) and (e); and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).  Defendant appeals his convictions and sentence.  For reasons that follow, we **AFFIRM**.

## I.       Background

Over the course of two years, Defendant, along with his two romantic partners, Brandon Russell ("Russell") and Michael Henry ("Henry"), engaged in sexual acts with eight children. Defendant photographed and videotaped the children while engaging in the sexual acts.  To protect the identities of the children, we shall refer to them as Child/Children 1–8, consistent with the terminology used by the parties in the district court, as well as the wording used in the Third Superseding Indictment and the entirety of the record.  Children 1–7 are male; Child 8 is female.

Children 2 and 3 began frequenting Defendant's home in the summer of 2012. Defendant, Russell, and Henry engaged in sexual conduct with the children and photographed their exploits.  Contact with Children 2 and 3 ultimately ended after they refused to continue visiting Defendant's home.

Defendant's illicit sexual conduct with Children 1, 7 and 8 began in the summer of 2013. The children are siblings, and Defendant watched the children after school.  At trial, through closed-circuit television testimony, Child 1 testified that Defendant forced him to watch pornographic videos, and threatened to kill Child 1's family if he told anyone about the illicit conduct.  Child 1 further testified that Defendant: (1) performed manual genital stimulation on Children 1 and 7; (2) inserted his penis into Child 1's rectum; and (3) wiped his semen on Child 1's chest.  Child 1 was in the sixth grade at the time he delivered his testimony.  Additionally, Child 7, who was in the third grade at the time he delivered his closed-circuit television

testimony, stated that Defendant rubbed his buttocks on numerous occasions. The children's mother, Robin Spindlow ("Spindlow"), authenticated an illicit video that depicted Defendant and Child 1 masturbating, and Defendant attempting to convince Child 1 to perform oral sex on him.

Children 4, 5, and 6 often visited the home of Defendant, starting in the summer of 2014. Children 4 and 6 are brothers. Child 6 testified that Defendant provided the children with liquor and cigarettes. Child 6 also testified that he and Children 4 and 5 would watch pornographic videos with Defendant on Defendant's bed. Russell testified that Children 4-6 would take showers at Defendant's home. Unbeknownst to the children, there was a hidden camera in the bathroom. Defendant positioned the video camera at groin height, in such a way that it would capture the genitals and pubic region of the children as they entered and exited the shower. The video camera transmitted its images to a set of VCRs in Defendant's bedroom. From these videos, Defendant created a shorter video that cut out some of the "dead time."

Ultimately, Children 1 and 7 informed their mother about the conduct occurring at Defendant's home, and Spindlow reported Defendant to the police. Consequently, an investigation began, and on April 20, 2014, police executed a search warrant on Defendant's home and seized various electronics that captured Defendant's sexual exploits on the children. Defendant was charged with seven counts of Sexual Exploitation of a Child and/or Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a) and (e); and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). At trial, defense witnesses testified that Defendant engaged in activities at night that he would not be able to remember, such as preparing food and talking in his sleep. The jury convicted Defendant on all counts, and he was sentenced to 2,880 months. This timely appeal followed.

## II.    Applicable Law and Analysis

### 1. Closed Circuit Testimony

Defendant first asserts that the district court erred in allowing Children 1 and 7 to testify by closed-circuit television, because "the evidence presented failed to establish a significant likelihood that the witnesses would suffer trauma by testifying in open court."

The Sixth Amendment declares that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witness[es] against him." This guarantee is not absolute. In *Maryland v. Craig*, 497 U.S. 836 (1990), the Supreme Court declared that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id.* at 855. The Court held that approval of the use of closed-circuit television testimony is a case-specific determination in which the trial court must: "hear evidence and determine whether use of the [system] is necessary to protect the welfare of the particular child [seeking] to testify"; "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and "find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, i.e., more than mere nervousness or excitement or some reluctance to testify." *Id.* at 855–56 (internal citations and quotation marks omitted). Consequently, in response to the *Craig* ruling, Congress passed 18 U.S.C. § 3509, "which sets forth the conditions under which a child may testify by closed-circuit television." *United States v. Moses*, 137 F.3d 894, 898 (6th Cir. 1998). The statute states the following in relevant part:

> (B) The court may order that the testimony of the child be taken by closed-circuit television . . . if the court finds that the child is unable to testify in open court in the presence of the defendant, for any of the following reasons:
>
> (i)     The child is unable to testify because of fear.
>
> (ii)    There is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying.
>
> (iii)   The child suffers a mental or other infirmity.
>
> (iv)    Conduct by defendant or defense counsel causes the child to be unable to continue testifying.

18 U.S.C. § 3509(b)(1)(B). Additionally, the statute requires the trial court to support its "ruling on the child's inability to testify with findings on the record." 18 U.S.C. § 3509(b)(1)(C).

The district court conducted a motion hearing to determine whether there was an adequate and case-specific showing of necessity for the use of closed circuit television for Children 1 and 7. We review the factual findings of the district court for clear error. *Moses*,

137 F.3d at 898 (citing *Hernandez v. New York*, 500 U.S. 352, 364 (1991)).  Having reviewed the record, we are persuaded that the district court did not err in concluding that the government made an adequate showing of necessity.

The district court heard evidence from Clint Irwin ("Irwin"), a licensed professional counselor in the state of Michigan.  Irwin possesses a college degree in criminal justice and a master's degree in community counseling.  At the time of the hearing, Irwin was pursuing a doctorate degree in community counseling.  Irwin testified to treating hundreds of children suffering from some kind of sexual abuse, receiving specific training in the field of trauma, and treating clients suffering from trauma as a result of sexual abuse.

Irwin treats Children 1 and 7.  He stated to the court that forcing the children to testify in the presence of open court would further add to their trauma.  Defendant stated that, from a clinical or psychological standpoint, the trauma suffered would be more profound than nervousness or reluctance to testify.  Additionally, Irwin stated that given Child 1's history, his emotional unrest and bad behaviors that resulted from the abuse endured at the hands of Defendant would resurface should he be required to testify in the presence of Defendant.  Further, Irwin stated that Child 7 has a tendency to shut down and not communicate and experiences difficulty discussing the sexual abuse inflicted on him by Defendant.  Irwin stated that Child 7's communication issues, his trouble sleeping, and past failures with interventions were symptoms of trauma from the sexual abuse he suffered and that Child 7 would regress back into avoidance behavior and possibly "shut down on the stand" should he be forced to testify in the presence of Defendant.

When the district court pressed Irwin on whether his testimony as to Children 1 and 7 was particularized, Irwin responded affirmatively, stating that the children displayed unique personality characteristics, and have "uniqueness in their support structures," leading him to question their ability to testify in the presence of Defendant.

Thereafter, the district court had the opportunity to question the children, and the children stated that it would be difficult to testify in Defendant's presence.  We are convinced that the district court made a case-specific finding that the child witnesses would suffer substantial fear

and be unable to testify or communicate because of Defendant's presence. The court determined that there was a factual basis to support the use of closed-circuit testimony; that Irwin's findings as to the children were particularized; and that the opportunity to interview and observe the children directly reinforced the court's understanding of the expert's conclusion that the risk of trauma is substantially more likely in the presence of Defendant than it would be outside of his presence. Further, the district court was persuaded by Irwin's testimony that the children would be traumatized by the presence of Defendant, that the emotional stress that would be endured was more than *de minimis*, and that the closed-circuit television procedure was also necessary to protect the welfare of children. The district court made an adequate case-specific showing of necessity for the use of closed-circuit television.

### 2. Defendant's Federal Rule of Evidence 403 Claim

Next, Defendant argues that the district court erred in admitting evidence pertaining to Defendant's: grooming activity, sexual assaults on children, activity with children, and attempted production of child pornography. Specifically, at the final pretrial conference, the government stated that it planned to introduce witness testimony from Children 1 and 7 that they witnessed Defendant's attempt to perform oral sex on their two-year old sister, Child 8, which resulted in Child 8's urinating in Defendant's mouth. The district court gave a provisional ruling, in which it stated that the government should be able to pursue this line of questioning. The district court further stated that its decision was consistent with Federal Rules of Evidence 403 and 414, and our holding in *United States v. Seymour*, 468 F.3d 378 (2006). Defendant asserts that Federal Rule of Evidence 403 weighed against the admission of alleged cumulative evidence of sexual misconduct. We disagree.

A district court's evidentiary rulings are reviewed under the abuse of discretion standard. *Seymour*, 468 F. 3d at 386 (citation omitted). Further, when "reviewing challenges to evidence based on Rule 403, we must give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.* at 386 (citations and internal quotations omitted).

Rule 414 states that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child

molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a). Evidence of similar crimes of child molestation, admissible under Rule 414, is subject to Rule 403 analysis, which balances the probative value of relevant evidence against potential unfair prejudice, confusion of the issues, and misleading of the jury. Fed. R. Evid. 403. However, as the government asserts, the testimony regarding the defendant's assault on Child 8 was never introduced and any limited testimony which may have referenced the incident or Child 8 at trial was never objected to by defense counsel. Even assuming that an objection to this testimony had been properly raised at trial, as the district court properly explained, the evidence of molestation that the government sought to present, which "involve[d] a child who is a sibling of two of the named victims in the other substantive counts in a time frame that is also involved with acts that the government intend[ed] to prove [D]efendant committed with respect to [Children 1 and 7,]" was highly probative. Children 1, 7 and 8 were siblings and were assaulted by Defendant in the presence of each other. The potential accounting of the abuse they endured by watching Defendant rape their younger sister was connected to their own suffering and therefore pertinent to the government's case. Accordingly, we find no error, plain or otherwise.

### 3. Child 3's Prior Consistent Statement

Defendant contests the district court's admission of Agent Timothy Kruithoff's ("Kruithoff") statement that Child 3 disclosed to him that Defendant had taken nude photographs of Child 3, and that this disclosure was made before Kruithoff showed Child 3 the photographs. Defendant also contests the admission of nude photographs of Child 3. We review a district court's evidentiary rulings for abuse of discretion.[1] *United States v. Chalmers*, 554 Fed. App'x 440, 449 (6th Cir. 2014).

---

[1]The government asserts that we should review the district court's admission of the photographs for plain error, consistent with our holding in *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989), because Defendant purportedly objects to admission of the photographs on a basis different from that asserted at trial. (*See* Appellee Br. at Pg. 41–42.) The government's contention is immaterial, because Defendant's claims fail under the less deferential abuse-of-discretion standard.

### a. Kruithoff's Testimony

Child 3 testified that on two occasions he was served alcohol at Defendant's home. On the second occasion, he drank four large glasses of vodka cocktails. Child 3 also testified that while drinking, Child 3 removed his clothes, Defendant touched his genitals, and the abuse was photographed. During cross examination, Child 3 told defense counsel that he did not recall the events of that night until he was shown photographs. On redirect examination however, Child 3 clarified that he recalled the events prior to being shown any photographs. Subsequently, Kruithoff testified that, prior to Kruithoff showing Child 3 the images, Child 3 informed Kruithoff that he was aware of the fact that nude photographs of him were taken.

Defendant argues that the statement did not qualify as a prior consistent statement and that prior to admission of the statement, Child 3 had already been rehabilitated, so there was no need to admit the statement. Kruithoff's statement was admissible. Previously, a prior consistent statement could only be admitted for the truth of the matter asserted to rebut a charge of recent fabrication. *See* Fed. R. Evid. 801(d)(1)(B) (2011). However, in 2014, subparagraph (B) was split into two clauses, including the new clause (ii), which allows prior consistent statements to be admitted for the truth of the matter asserted if offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B) (ii). "The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness – such as the charges of inconsistency or faulty memory." Fed R. Evid. 801 (Advisory Committee's Note to 2014 Amendment). Defendant certainly attacked Child 3 on the basis of a faulty memory: Defendant's counsel stated to the district court that Child 3 did not know about some of the photographs until after they were taken. Further, he stated to Child 3 "If you think back about what actually happened that night, though, without [the] photos, [ ] you really don't remember." Child 3's statement to Kruithoff was a consistent statement that rebutted Defendant's attack on Child 3's purportedly faulty memory, and therefore, the district court's admission of the testimony was proper.

**b.  Photographs of Child 3**

Regarding the photographs, Child 3 testified that photographs of Defendant touching Child 3's genitals were taken by Defendant and Russell while Child 3 was intoxicated. Defendant argues that because Child 3 may not have realized that the photographs were taken until after the fact, the government could not rely on his testimony to lay a foundation for their admission.  We disagree.  Parties may authenticate evidence through "testimony of a witness with knowledge . . . that an item is what it is claimed to be."  Fed. R. Evid. 901(b)(1); *United States v. Kessinger*, 641 Fed. Appx. 500, 505 (6th Cir. 2016).  Defendant argues that Child 3 "had no memory of the nights, so he could not have had knowledge of the nights and their representation in the photographs."  While Child 3 initially stated that he could not recollect the events of the night without the photographs, he later clarified his testimony by stating that that he was able to recall the events of the night prior to being shown any pictures of the night.  His testimony was thereafter corroborated by Kruithoff.  Further, Child 3 has personal knowledge of his appearance, as well as Defendant's appearance and the location because he visited Defendant at his home on numerous occasions.  For these reasons, we find that Defendant had knowledge rendering him able to identify himself and Defendant in the illicit photographs, consistent with Rule 901(b).  The district court therefore did not abuse its discretion in admitting the photographs.

**4.  Defendant's Photo Album**

During direct examination of Defendant, when defense counsel inquired into whether Defendant had knowingly touched the children inappropriately or had knowingly taken photos of his illicit conduct, Defendant replied "No, I did not.  I'm not into taking any type of pictures. Even porn pictures.  I don't even like them taken of myself."  Thereafter, during cross examination, Defendant conceded to the fact that he was the person in a video that was shown to the jury, in which he masturbated with Child 1 and attempted to get Child 1 to perform oral sex on him. Yet, when pressed on his statement that he was not into taking pictures or pornographic pictures, he again responded negatively.  Thereafter, the government sought and was granted admission of Defendant's photo album into evidence; however, the album was not published to the jury.  The photo album was titled "Chris and Jeff nude pictures."

At trial, Defendant objected to the introduction of the photo album into evidence, asserting the following: "I object to Exhibit 14. I'm not sure what's – well, I think I know what it's going to be used for, and I think it's an improper purpose." However, on appeal, Defendant attacks the introduction of the album into evidence because it was irrelevant, not authenticated, and highly prejudicial. When a "party objects to the submission of evidence on specific grounds in the trial court, but on appeal the party asserts new grounds challenging the evidence," we review for plain error. *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989).

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Further, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The district court did not abuse its discretion by admitting the photo album into evidence. Defendant's assertions to the contrary are meritless.

The photographs were relevant to the government's case. Defendant claimed that he did not photograph his illicit conduct. To bolster his claim, he made a blanket assertion that he "wasn't into taking pictures," and he didn't like nude photographs taken of himself. As a result of this testimony, the photo album was certainly pertinent, since admission of the album arguably disproved Defendant's assertion. Defendant kept the nude photos taken of himself and a former boyfriend, and even labeled the album. Objectively, Defendant's behavior is not typical of someone who does not like to be photographed naked, or nude photographs in general. Defendant argues that because of the graphic nature of the photographs, the photographs were unfairly prejudicial because their content could have angered the jury. However, the photographs were not shown to the jury, and as the government asserts, the mere "discussion of [the photographs] in the record hardly eclipsed the nature of the charged conduct – which included the creation of a video showing [Defendant] engaged in sexual activity with a ten-year-old."

Further, Rule 901(a) was satisfied. Defendant's testimony supported the finding that the item is what it was claimed to be. Defendant recognized the photo album as his own; thus, he certainly knew the contents of the album. Further, after the album was admitted, Defendant confirmed that the photos in the album were nude photos of himself, and that he was aware that the photos had been taken at the time. Accordingly, we find that the district court did not err in admitting the photographs.

### 5.  Admissibility of Henry's Prior Statements

When the district court qualified Henry as an unavailable witness, Defendant sought admission of certain statements Henry made to federal agents. The district court denied the introduction of the proffered statements into evidence, having determined that the statements were not statements against interest under Rule 804(b)(3). On appeal, Defendant asserts that the district court erred in failing to admit the statements, because the statements are against Henry's penal interest and that the denial of admissibility deprived Defendant of a meaningful opportunity to present a complete defense, in violation of the Sixth Amendment. We review a district court's decision to admit or exclude statements under Rule 804 for abuse of discretion. *United States v. Johnson*, 581 F. 3d 320, 326 (6th Cir. 2009).

Statements against a declarant's penal interest are not excluded by the rule against hearsay if the declarant is unavailable as a witness. Fed. R. Evid. 804(b). A statement against interest includes any statement which, at the time of its making, "a reasonable person in the declarant's position would have made only if the person believed it to be true because . . . it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). "The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Williamson v. United States*, 512 U.S. 594, 600 (1994). Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Id.* at 600–01. "The district court may not just assume . . . that a statement is self-

inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Id.* at 601.

Defendant sought to introduce the following statements made by Henry to federal agents: (1) that Henry lived with Defendant for "a short while in 2013 to 2014"; (2) that Henry installed cameras at Defendant's residences; (3) that Henry "does computer work on the side"; (4) that Henry reformatted computers for Defendant; (5) that Henry set up a DVR system in Defendant's bedroom; (6) that Henry used Defendant's computers at Defendant's home; (7) that Henry stated to a federal agent "I'm big with tech stuff"; (8) that Henry claimed that he did not know Child 2 and had "never heard of him"; and (9) that Henry "met Child 3 on one occasion on the street." We find that the district court did not abuse its discretion in refusing to admit the proffered statements. Defendant appears to argue that because Henry invoked his Fifth Amendment rights, we should assume that the statements are against his penal interests. Defendant's reasoning is contrary to the requisite analysis required by the Supreme Court. "[W]hen ruling upon a narrative's admissibility under this rule, a court must break it down and determine the separate admissibility of each 'single declaration or remark.'" *U.S. v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (quoting *Williamson*, 512 U.S. at 599). This means that a court, "when determining the admissibility of a narrative, must examine it *sentence by sentence*," in order to determine what sentences are self-inculpatory and what sentences are collateral. *Id.* at 960 (emphasis added). Defendant fails to articulate how each declaration was self-inculpatory. Having reviewed the statements, we, like the district court, conclude that Henry's separate declarations are either innocuous, or attempts to exculpate and shift blame to others, and were therefore not admissible under the statement-against-interest exception to hearsay. Further, Defendant's argument that deeming the statements inadmissible hearsay denied Defendant the right to present a complete defense in violation of the Sixth Amendment is meritless. While "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" a defendant does not have "an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (citations and brackets of internal quotation marks omitted). Accordingly, we hold that the district court did not abuse its discretion in denying the separate admissibility of each statement made by Henry.

**6. Sufficiency of the Evidence**

Next, Defendant asserts that there is insufficient evidence to support his criminal conviction. We summarily address this argument. "When reviewing a criminal conviction for sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "All reasonable inferences and resolutions of credibility are made in the jury's favor." *Id.* (quoting *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012)). "A convicted defendant bears 'a very heavy burden' to show that the government's evidence was insufficient." *Id.* (quoting *United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012)).

Defendant was convicted of seven counts of Sexual Exploitation of a Child and/or Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a) and (e); and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). The jury was shown photographic and video evidence of Defendant engaged in illicit sexual acts with the children. The children, Russell, and even Defendant, testified to the fact that Defendant engaged in the conduct he was charged with. Defendant also confirmed his identity in a video, shown to the jury, which captured Defendant and Child 1 masturbating, and Defendant attempting to persuade Child 1 to perform oral sex on Defendant. Although Defendant asserts that: sometimes he could not remember the acts he engaged in; he lacked the requisite *mens rea* for some of the offenses; he was unaware of the existence of any of the images enumerated in Counts 1 through 7; and the nude photographs of the children did not qualify as "lascivious," the trial transcript, as described at length and in graphic detail in the preceding paragraphs, is replete with evidence to the contrary that the jury was able to rely on in rendering its verdict. Defendant fails to demonstrate that no rational trier of fact could have

agreed with the jury.  Accordingly, we find that the evidence was sufficient for the jury to convict Defendant of the charges.

**7.  Substantive Reasonableness of Defendant's Sentence**

Lastly, Defendant asserts that his sentence was substantively unreasonable, due to the length of the sentence, and because there are other individuals who have committed similar offenses and received shorter sentences.  When reviewing the substantive reasonableness of a sentence under an abuse-of-discretion standard, we "'tak[e] into account the totality of the circumstances, including the extent of any variance from the Guidelines range.'"  *United States v. Sandoval*, 501 F. App'x 491, 492 (6th Cir. 2012) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).  "The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)."  *Id.* (quoting *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010)).  "For a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)."  *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (internal citation and quotation marks omitted).

Defendant was found guilty on Counts 1 through 9 of the Third Superseding Indictment after asserting a plea of not guilty and was sentenced to "a total term of two thousand eight hundred eighty (2,880) months, consisting of three hundred sixty (360) months on each of Counts [1] through [7], two hundred forty (240) months on Count [8], and one hundred twenty (120) months on Count [9], all terms to be served consecutively, to ensure a guideline sentence of life in prison."  Defendant's sentence was within the guidelines.  This court applies a rebuttable presumption of reasonableness in cases involving within-guidelines sentences.  *See United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) ("A properly calculated within-guidelines sentence will be afforded a rebuttable presumption of reasonableness on appeal.").  This presumption is not binding; rather, it "reflects the fact that, by the time [we] consider[ ] a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission . . . have reached the *same* conclusion as to the proper sentence in the particular

case." *Rita v. United States*, 551 U.S. 338, 347 (2007) (emphasis in original). "That double determination significantly increases the likelihood that the sentence is a reasonable one." *Id.*

Defendant fails to rebut the presumption that his sentence is substantively reasonable. He sets the basis of this contention on two dissimilar cases – *United States v. Studabaker*, 578 F.3d 423 (6th Cir. 2009) and *United States v. Richards*, 659 F.3d 527 (6th Cir. 2011) – in which defendants received lesser sentences. Defendant claims these cases serve as "more general comparisons," demonstrating the unreasonableness of his sentence and that a lesser sentence would better serve his case. Defendant also asserts that consistent with 18 USC § 3353(a)(6), sentencing courts should strive to eliminate unwarranted sentencing disparity. Defendant's argument is meritless. We have repeatedly "criticized the comparison of the defendant's sentence to those imposed in other singular cases as weak evidence to show a national sentencing disparity." *United States v. Rossi*, 422 F. App'x 425, 435 (6th Cir. 2011). Moreover, "the fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *United States v. Reilly*, 662 F.3d 754, 759 (6th Cir. 2011) (quoting *Gall*, 552 U.S. at 51). Having reviewed the record, we are confident that the district court understood its discretion to make a departure and declined to do so, having considered the § 3553(a) factors and the totality of the circumstances when imposing its sentence. Therefore, Defendant's sentence was substantively reasonable.

### III. Conclusion

Accordingly, for the above-mentioned reasons, we **AFFIRM** the convictions and sentence of the district court.

---

**CONCURRENCE**

---

SUTTON, Circuit Judge, concurring. I join Judge Keith's thoughtful opinion in full. I write separately to note the pushing tendencies of one line of Confrontation Clause precedents and the pulling tendencies of another. Here is what the Confrontation Clause says: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

*Maryland v. Craig* asked whether this language permitted States to deny criminal defendants the right to confront child witnesses face to face when they provide testimony against them at trial via one-way closed-circuit television. 497 U.S. 836 (1990). A 5–4 majority held that States could do just that when the "denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850.

Fourteen years later, *Crawford v. Washington* asked whether a court could admit an unavailable witness's statement, made without face-to-face confrontation or opportunity for cross-examination, if it had "adequate indicia of reliability." 541 U.S. 36, 42 (2004). A 7–2 majority gave an unqualified no. It was not willing to "replac[e] categorical constitutional guarantees with open-ended balancing tests" based on "amorphous notions of 'reliability.'" *Id.* at 61, 67–68.

*Crawford* did not overturn *Craig*. And *Craig* governs us here, as junior courts may not overrule the handiwork of their superiors.

But the two opinions would give Janus a run for his money. Consider how they treated another decision of the Court: *Ohio v. Roberts*, 448 U.S. 56 (1980). *Craig* relied heavily, indeed almost entirely, on *Roberts* to justify its decision. 497 U.S. at 846–50. But *Crawford* overruled *Roberts* with respect to testimonial statements. 541 U.S. at 60–69.

Or consider how the two opinions characterized the Confrontation Clause guarantee. *Craig* treated the Clause as a safeguard for evidentiary reliability as measured by the judge in that case and today's rules of evidence. *See* 497 U.S. at 849. But *Crawford* held that it was a procedural guarantee that "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination" in front of the accused. 541 U.S. at 61.

Or consider how the opinions treated a defendant's right to face-to-face confrontation with the witnesses against him. *Craig* said that the "face-to-face confrontation requirement is not absolute." 497 U.S. at 850. But *Crawford* said that a face-to-face meeting between an accuser and the accused was an essential part of the confrontation right. 541 U.S. at 43–45. "Dispensing with confrontation because testimony is obviously reliable," *Crawford* observed, "is akin to dispensing with jury trial because a defendant is obviously guilty." *Id.* at 62.

Or consider the methodology of each opinion. *Craig* looked to the "growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court" to identify new exceptions to the right to face-to-face confrontation. 497 U.S. at 855. But *Crawford* looked to the original publicly understood meaning of confrontation to determine when the exception-free words of the guarantee ("[i]n all criminal prosecutions") should have exceptions. 541 U.S. at 42–50.

Or consider how each opinion describes the relationship of the Clause to the rules of evidence. *Craig* worried that adherence to the words of the guarantee was "too extreme" and would "abrogate virtually every hearsay exception" developed by the rules of evidence up to that point. 497 U.S. at 848 (quoting *Roberts*, 448 U.S. at 63). But *Crawford* refused to rely on "the law of evidence" at the time of the trial because it "would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices." 541 U.S. at 51.

Or consider each opinion's view of exceptions to the guarantee. *Craig* offered no hint that there was any limit to the kinds of exceptions that the *Roberts* balancing test would allow then or in the future. But *Crawford* carefully identified the kinds of exceptions that might be

allowed under its approach and conspicuously never mentions *Craig* as one of them.  *See id.* at 53–55.

I am not the first person to acknowledge that the two decisions face in different directions.  *See, e.g., State v. Jackson*, 717 S.E.2d 35, 39 (N.C. Ct. App. 2011); *Coronado v. State*, 351 S.W.3d 315, 321 (Tex. Crim. App. 2011); *United States v. Pack*, 65 M.J. 381, 384 (C.A.A.F. 2007); David M. Wagner, *The End of the "Virtually Constitutional,"* 19 Regent U.L. Rev. 469 (2007); Marc C. McAllister, *The Disguised Witness and* Crawford*'s Uneasy Tension with* Craig, 58 Drake L. Rev. 481, 507–512 (2010); *Children as Witnesses: A Symposium*, 82 Ind. L.J. 909 (2007).  In its brief in *Crawford*, the Solicitor General for the United States warned that the "categorical approach" sought by the criminal defendant in *Crawford* was "incompatible" with *Craig*.  Brief for the United States as Amicus Curiae at 20–21, *Crawford v. Washington*, 541 U.S. 36 (2004) (No. 02-9410).

Some intrepid courts have tried to reconcile *Craig* and *Crawford*.  *See, e.g., People v. Gonzales*, 281 P.3d 834, 863 (Cal. 2012); *State v. Vogelsberg*, 724 N.W.2d 649, 654 (Wis. Ct. App. 2006).  I for one am not convinced by their efforts.  To respect the one decision slights the other.

This is not an idle matter, as the stakes of today's case confirm.  When courts hand out 2,880-month sentences for criminal convictions, all within the recommended range of the Sentencing Guidelines and all authorized by the relevant statutes, it's fair to say that society deems the underlying conduct heinous.  As well it should when it comes to the sexual abuse of a child.  But just as the Bill of Rights protects speech we hate, it protects those suspected of conduct we despise, whether child abuse (as in *Craig* and here) or attempted murder (as in *Crawford*).  Sex offenders have free-speech rights.  *See Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).  And suspected sex offenders, like all suspects of crime, are entitled to a slew of constitutional procedural protections, the right to confrontation among the foremost.  Given the lengthy prison sentences that convicts in this area often face, the lifetime monitoring of their movements usually required after their release, and the stigma attached to their crimes, the marked contrast between the confrontation rights provided to most criminal suspects under *Crawford* and to sex-offender suspects under *Craig* deserves a justification.  The right to

confront a witness usually is the chief protection against a false accusation. How can we guarantee the full effect of that protection when two lines of cases, both purportedly good law, dispute the nature and reach of the Clause that guarantees it?

At a minimum, a few questions deserve consideration by the Court. How can *Craig* survive in the absence of the *Roberts* balancing test? Perhaps stare decisis should save *Craig*. The premise of stare decisis after all is that some wrongly decided decisions should stand in the interests of stability. But it is easy to imagine one class of criminal defendants wondering why stare decisis should save *Craig* but did not save *Roberts*.

Maybe *Craig* could survive as an exception under the *Crawford* approach? *Crawford* noted that the Confrontation Clause is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." 541 U.S. at 54. But at this point I am not aware of any historical exceptions rooted in the common law or fairly analogous to exceptions rooted in the common law that would support *Craig*.

How essential is face-to-face confrontation under the Confrontation Clause? *Craig* acknowledged that it is important but could be balanced away. 497 U.S. at 856–57. In his *Craig* dissent, Justice Scalia disagreed, noting that "whatever else it may mean," "'to confront' plainly means to encounter face-to-face." *Id.* at 864. In *Crawford*, he reiterated the view he expressed in *Craig*. 541 U.S. at 42–45, 57–60. "Virtual confrontation might be sufficient to protect virtual constitutional rights." Order of the Supreme Court, 207 F.R.D. 89, 93 (2002) (Scalia, J.). But does it suffice "to protect real ones"? *Id.* The question deserves an answer.

Even on *Craig*'s own terms (in truth, *Roberts*' terms), did the Court correctly frame the balancing of interests? *Craig* permitted Maryland to balance the right of the child witness to avoid trauma against the right of the defendant to confront the witness. Is that the correct question? Requiring the prosecutor either to prove the allegation by confronted witnesses (or other evidence) or to drop the charge is just as plausible a way to think about it. Wouldn't that approach benefit both the child, who often would not have to suffer the trauma of testimony, and

the defendant, who would not lose an opportunity to confront an accuser face to face, which even *Craig* recognized as a right not lightly abandoned? *See* 497 U.S. at 850.

What does the current psychological literature say about the ordeal of reliving such horrifying events? And what kind of differences, incremental or otherwise, are there between reliving these experiences in front of the lawyers and court officials and social workers (as still required under *Craig*) as well as the assailants (as potentially required under *Crawford*)? Do the benefits of *Craig* still outweigh its costs according to today's psychologists?

What would be the practical impact of overruling *Craig*? A child's testimony no doubt may facilitate efforts by the State to convict individuals of family violence and molestation. But it often is not the only evidence available. Look no further than this case for an example. The government points to Cox's library of child pornography, the groin-height cameras he set up in the bathroom, a lewd video involving Cox and a young child, and the trial testimony of older victims (then between the ages of 13 and 21) who were cross-examined in Cox's presence. *See* R. 186 at 1019–30; R. 187 at 1085; R. 188 at 151. Yes, the prosecutors might not have obtained a 240-year sentence without *Craig*. But there was plenty of evidence to convict Cox of many crimes.

No doubt, cases of sexual abuse and domestic violence may arise in which the child's testimony is the primary, even the only, evidence available. But which way does that cut? Is the point of *Craig* to make it easier to convict suspects of certain crimes? To mark the defendant's cards in advance through an unusual closed-circuit television used only when the victim testifies? The crucible of cross-examination, carried out in the company of the accused without the assistance of guilt-suggestive technology, still seems to be the best way to test whether a defendant should suffer decades in prison and a lifetime condemned as a sex offender based on witness testimony.

Those accused of sexually abusing children, it's fair to say, are not sympathetic defendants. But *Crawford* explained that the Framers drafted the Confrontation Clause to ensure that those accused of the worst crimes have the opportunity to prove their innocence through a specific, time-tested procedure. *Craig* is in tension with, if not in opposition to, that holding.

And yet, both decisions stand. American judges and lawyers and citizens often take great pride in talking about the constitutional protections we accord individuals suspected of the most offensive crimes. I sometimes wonder if we mean it.